Filed 1/30/14  Certified for publication 2/26/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TINA YESSON,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY,<br><br>      Defendant and Respondent. | A136527<br><br>(Sonoma County Super. Ct. No. SPR83944) |

INTRODUCTION

Tina Yesson, successor trustee of the John C. Enrico 1999 Revocable Living Trust, appeals from the order of the Sonoma County Superior Court denying her petition for an order determining that she, as the trustee of her father's trust, had the right to sell the taxi permit (also known as a taxi medallion) held by her father at the time of his death, under the Taxi Medallion Sales Pilot Program (Pilot Program) adopted by respondent San Francisco Municipal Transportation Agency (SFMTA).  The court concluded that neither the medallion nor the right to sell the medallion became the property of the decedent or of his estate or trust as a result of SFMTA's authorization of the Pilot Program.  We shall affirm the trial court, but on the alternative grounds found "persuasive" by the trial court, that the Pilot Program did not go into effect until March 28, 2010, after Enrico's death.

1

BACKGROUND[1]

On December 12, 1968, the San Francisco Police Commission granted John C. Enrico permit number 846, to operate a taxicab in San Francisco (sometimes referred to as the City). Under then-existing city law, taxi permits could be inherited, sold, assigned and transferred.

In 1978, San Francisco voters passed Proposition K, an initiative ordinance establishing a new system of regulation for city-issued taxi medallions. Proposition K barred the inheritance, sale, assignment or transfer of taxi medallions. Under Proposition K, all taxi medallions belonged to the City, had to be held by working drivers, and were distributed as they became available to individuals on the Medallion Waiting List. In accordance with the requirements of Proposition K, Enrico surrendered his permit to the City and on December 17, 1979, the City issued him taxi medallion number T-291. His operation of the medallion was subject to the requirements of Proposition K, as well as to additional taxi regulations codified in Article 16 of the San Francisco Police Code and subsequently in the San Francisco Transportation Code (Transportation Code). In 1984, the police department approved Enrico's request to lease Medallion T-291 to Yellow Cab Company. Enrico leased the medallion to Yellow Cab Company from 1984 until his death in 2010. During this time, Yellow Cab Company paid Enrico a monthly lease fee in exchange for operating the medallion.

In 2007, San Francisco voters passed Proposition A, giving the San Francisco Board of Supervisors the power to transfer regulatory authority over taxi affairs to the SFMTA. Authority to regulate San Francisco taxis passed to SFMTA in March 2009. Subsequently, the SFMTA Board of Directors (SFMTA Board) re-codified Proposition K's requirements, as well as additional taxi regulations, in the Transportation Code, Division II, Article 1100, et seq. Proposition A also gave the SFMTA Board the power to adopt taxi regulations that would override "any prior ordinance," including the provisions of Proposition K.

---

[1]The parties filed a Stipulated Statement of Facts in the trial court.

2

By 2009, when SFMTA assumed its regulatory function over the local taxi industry, significant flaws had become apparent in the process by which medallions were issued. It is unlawful to operate a taxi in the City without a City-issued medallion. The demand for medallions far exceeded the supply and medallions were issued to drivers on a waiting list, for a fee of approximately $1,600. Approximately 3,000 names were on the waiting list at the time of trial and people qualifying for medallions had been on the waiting list for about 15 years. A medallion holder is allowed to lease the medallion to a cab company or to a driver. It is thus an income-producing asset for the medallion holder. However, because the waiting list is so lengthy, applicants are often senior citizens by the time they actually receive a medallion. At the same time local law requires that every medallion holder who received a medallion after Proposition K was adopted in 1978, and who is physically able to do so must be a so-called "full-time driver." That is, the medallion holder must actually drive his or her taxi for at least 156 four-hour shifts, or for 800 hours, during a single calendar year. (Transportation Code, § 1102, subdivision (o).) The advanced age of many medallion holders can make it difficult, or even unsafe, for them to comply with the City's legal requirements, especially the "full-time driving" requirement. SFMTA began exploring possible reforms to the Proposition K-based medallion distribution service, holding multiple town hall meetings to solicit input from various stakeholders.

At a public hearing on February 26, 2010, the SFMTA Board approved Resolution No. 10-029, adopting amendments to Transportation Code, Division II, Article 1100, to implement the Pilot Program.[2] The resolution explained that the "Pilot Program

---

[2]The Resolution itself stated in relevant part:

"RESOLVED, That the Board adopts the Taxi Medallion Sales Pilot Program, allowing the SFMTA to sell up to 60 Taxi Medallions that have been returned to the SFMTA, and allowing Taxi Medallion Holders age 70 and above and other Taxi Medallion Holders who are disabled to sell their Medallions at a price to be established by the SFMTA to qualified taxicab Drivers, as set forth in amendments to Transportation Code Division II, Article 1100; and, be it further

"RESOLVED, That no Taxi Medallion shall be purchased sold [sic] pursuant to the Taxi Medallion Sales Pilot Program until the Executive Director CEO adopts a

3

represents an interim measure that would allow the San Francisco taxi industry to gradually transition away from the Waiting List system of Medallion distribution that has characterized the San Francisco taxi industry for 32 years" and that it "represents an opportunity to collect information, monitor results and elicit industry recommendations for the purpose of adopting a long-term Taxi Medallion reform solution . . . ." The resolution enacted new Transportation Code section 1109, subdivision (e), stating, among other things: "Any medallion held by a natural person who: (1) has attained or will attain the age of 70 years old or older as of December 31, 2010; or (2) has a bona fide disability . . . is eligible for sale in accordance with this subsection (e)." (Transportation Code § 1109, subd. (e)(1).) Transportation Code section 1109, subdivision (e)(3) authorized the Director of Transportation to set the initial medallion sales price after a public hearing and at a price not to exceed $400,000 and after considering certain specific factors in setting that price. Transportation Code section 1109, subdivision (e)(6) further stated that "Medallions shall be purchased and sold under the Pilot Program in accordance with procedures adopted by the SFMTA."

The resolution also stated that: "[p]rior to authorizing any Medallion sale, SFMTA staff will return to the Board to inform the Board of the established Medallion Sale Price and to propose additional regulations governing (1) Medallion financing following meetings with potential lenders, and (2) the composition of an industry group to monitor the results of the Pilot Program that will provide recommendations for long-term taxi industry reform . . . ."

---

Medallion Sale Price and provides notice to the public of such Medallion Sale Price; and, be it further

"RESOLVED, That any Medallion offered to an applicant on the Waiting List after February 16, 2010 shall be counted toward the number of Medallions offered to Waiting List applicants pursuant to the Taxi Medallion Sales Pilot Program; and, be it further

"RESOLVED, That the Board ratifies the decision of SFMTA staff to close the Waiting List effective December 16, 2009 and all other actions by SFMTA staff between March 1, 2009 to February 15, 2010 taken for the purpose of implementing Transportation Code, Division II, Article 1100."

On March 23, 2010, Enrico died at the age of 96.

At public hearings held March 30, April 20 and May 4, 2010, the SFMTA Board adopted additional regulations to implement the Pilot Program. On or about April 14, 2010, SFMTA mailed to potentially eligible medallion sellers and buyers a "Notice & Opportunity to Participate in Taxi Medallion Sales Pilot Program," a "Buyers' Participation Form," and a "Sellers' Participation Form."

On April 21, 2010, Yesson, a resident of Sonoma County, filled out and signed a "Sellers' Participation Form" as "Trustee for John Enrico" and mailed it to the SFMTA, which received the form on April 28, 2010. On April 26, 2010, Yesson Notified Yellow Cab Company by phone of Enrico's death and on April 27, 2010, Yellow Cab Company transmitted written notice to the SFMTA that Enrico had died.

As of the May 15, 2010 filing deadline, the SFMTA had received approximately 300 Sellers' Participation Forms from medallion holders expressing a desire to participate in the Pilot Program. Upon receipt of the forms, SFMTA staff screened the forms to determine which applicants met the age requirement, disability requirement, or both requirements to be eligible to participate in the Pilot Program. Following the completion of the screening process, on or about June 9, 2010, the SFMTA sent "Commitment to Sell Agreements" to the medallion holders who it had determined were eligible to participate in the Pilot Program. The SFMTA did not send a "Commitment to Sell Agreement" to Yesson.

On August 11, 2010, the SFMTA wrote Yesson rejecting her request to participate in the Pilot Program and explaining its view that "[y]our father's interest in Medallion #T-291, which consisted of his right and duty to operate the medallion, expired upon his death. If, prior to his death, your father was eligible to sell his Medallion under the Pilot Program by virtue of either age or disability, that eligibility was also extinguished by his death" and his interest in the medallion "is not part of his estate."

In August 2010, the first sale of a medallion under the Pilot Program occurred. Yellow Cab Company returned Medallion T-291 to SFMTA for reissuance in February

2011.  SFMTA did not sell the medallion or otherwise use it in the Pilot Program. Rather, on March 11, 2011, it reissued the medallion to the next qualified applicant at the top of the waiting list, who paid SFMTA only the standard $1,600 processing fee.

On May 17, 2011, Yesson filed a claim against the City, alleging she had the right to sell Medallion T-291.  The City rejected her claim on June 22, 2011.  On September 2, 2011, Yesson filed the underlying petition in the Sonoma County Superior Court, seeking an order determining ownership of disputed trust property and for damages, restitution, and imposition of a constructive trust.

In her petition, Yesson asserted the 96-year-old Enrico was eligible to participate in the Pilot Program when it passed on February 26, 2010, and from that date forward was qualified to sell his medallion pursuant to the provisions of the amended Transportation Code.  She asserted he wished to do so and that he died after adoption of the Pilot Program, but before SFMTA promulgated formal procedures for qualified medallion holders to notify SFMTA of their eligibility and intention to sell.  Yesson argued below, as she does here, that upon his death and pursuant to his will, Enrico's personal property, including the medallion and the right to sell it, became the property of his trust.  She sought an order determining that title to the medallion was vested in her as trustee and requiring SFMTA to pay her $200,000, the amount a medallion holder would net by selling a medallion through the Pilot Program (the medallion sale value of $250,000, less a 15% Medallion Sale transfer fee and a 5% driver fund transfer fee).

The Sonoma County Superior Court denied the petition, finding:  "Beginning in 1978, decedent's taxi medallion was at all times owned by the City and County of San Francisco; the medallion was not, and never could be, property of the decedent or of his estate or trust.  Furthermore, the SFMTA did not confer a vested or alienable property right upon the decedent to sell his medallion through the Pilot Program, and, *a fortiori*, no such right could be transferred to the decedent's estate or trust."  It described Yesson's claim as " 'an attempt to cobble together a property interest where none exists.' "  The court also found "persuasive" SFMTA's argument that Resolution No. 10-029 did not take effect until after Enrico's death, but the court "prefer[red] to decide this case on

6

settled principles of the law of inheritance."  The court concluded, "Had the decedent survived a little longer, he likely could have benefitted from the Pilot Program.  His inability to so benefit was due to unfortunate timing.  It is not uncommon that the timing of changes in laws and regulations sometimes determines people's fortunes, yet bad timing establishes neither a denial of constitutional due process nor a cause of action for legal or equitable relief."

This timely appeal followed.

## DISCUSSION

### A. *Standard of Review*

As the parties here agree, the case was tried below on stipulated facts and so we apply the *de novo* standard of review.  (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888;  *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437.)

We agree with the initial argument made by SFMTA that adoption of Resolution No. 10-029, establishing the Pilot Program and amending the Transportation Code was a legislative act, subject to referendum.  Therefore, Resolution No. 10-029 took effect 31 days after adoption of the resolution and five days *after* Enrico's death.  Consequently, whether or not the resolution created any property rights—and we do not suggest that it did—Enrico was not possessed of any such rights at the time he died.

### B. *Referendum*

Under both the California Constitution and the Charter of the City and County of San Francisco, the initiative and referendum are powers reserved by the people.  (Cal. Const., art. II, § 9; S.F. City Charter, § 14.102.)[3]  "The referendum is the means by which

---

[3]"[C]harter cities cannot deny their citizens the referendum powers reserved in the California Constitution, although charters may properly reserve broader referendum powers to voters.  ' " 'The constitutional reservation goes to the full extent expressed by its language.  If the charter differs from the constitution in any respect it does not thereby diminish the powers reserved by the constitution.  On the other hand, if the powers reserved by the charter exceed those reserved in the constitution the effect of the charter would be to give to the people the additional powers there described.' [Citations.]  In

7

the electorate is entitled, as a power reserved by it under our state Constitution, to approve or reject measures passed by a legislative body. (Cal. Const., art. II, §§ 9, subd. (a), 11 & art. IV, § 1; *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591.)" (*Empire Waste Management v. Town of Windsor* (1998) 67 Cal.App.4th 714, 717 (*Empire Waste*); *Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099, 1108 (*Lindelli*).) "The initiative and referendum are not rights 'granted the people, but . . . power[s] reserved by them. Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation]. "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right not be improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." ' [Citations.]" (*Rossi v. Brown* (1995) 9 Cal.4th 688, 695; see *Lindelli, supra,* 111 Cal.App.4th at p. 1109.)

"An essential component of the referendum power is the ability to stay legislation until voters have had the opportunity to approve or reject it. With limited exceptions, every municipal ordinance is subject to an automatic 30-day stay before it becomes effective. ([Elections Code,] § 9235.) During that period, any qualified registered voter may circulate a referendum petition challenging the ordinance. ([Elections Code,] § 9237.) Provided that the requisite number of signatures is obtained, 'the effective date of the ordinance shall be suspended, and the legislative body shall reconsider the ordinance.' (*Ibid.*)" (*Lindelli, supra,* 111 Cal.App.4th at p. 1109.) Section 14.102 of the San Francisco Charter similarly provides for the referendum power to apply to ordinances adopted by the City.

---

other words, as between the provisions of the Constitution and the provisions of a city charter, those which reserve the greater or more extensive referendum power in the people will govern." ' [Citations.]" (*Rubalcava v. Martinez* (2007) 158 Cal.App.4th 563, 571; see also 38 Cal.Jur.3d (Aug. 2013 update) Initiative and Referendum, § 50, "Charter cities—Manner of exercise of power," fns. omitted.)

8

As explained in *Midway Orchards v. County of Butte* (1990) 220 Cal.App.3d 765 (*Midway Orchards*), "The power of referendum is simply *not* the power to *repeal* a legislative act . . . . Under current article II, section 9 [of the state Constitution], 'The referendum is the power of the electors to approve or reject statutes. . . .' The power is the same as the Legislature's approval of a bill. [Citation.] The power is to determine whether a legislative act should *become* law. [Citation.] It is not to determine whether a legislative act, once effective, should be repealed. [¶] In accord with this view of the referendum power, neither state statutes nor local ordinances subject to referendum go into effect during the time permitted for the filing of a referendum petition. [Citations.] Thus, 'A prime purpose of deferment of the effective date of ordinances is to preserve the right of referendum.' [Citation.]" (*Id.* at pp. 780–781.)

Moreover, "it is well established that any legislative act may be . . . subject to referendum, regardless of whether that act is denominated an 'ordinance' or 'resolution.' " (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 787, fn. 9; accord, *Midway Orchards, supra,* 220 Cal.App.3d at p. 777.) "Resolutions subject to referendum, like ordinances, are not effective until 30 days from the date of their enactment[.]" (*Midway Orchards* at p. 779.) A legislative act subject to referendum cannot be effective before the power of referendum can be exercised. (*Id.* at pp. 781–782.)

We recognize that resolutions ordinarily take effect immediately and that many administrative acts not subject to referendum are undertaken by resolution and are effective upon passage according to the usual rule. (*Midway Orchards, supra,* 220 Cal.App.3d at p. 782.) The determinative question then, is whether Resolution No. 10-029 amending the Transportation Code and enacting the Pilot Program was a legislative act and so subject to referendum as claimed by SFMTA or was an administrative action as claimed by Yesson.

**C. *Legislative Act***

"A referendum may review only *legislative* decisions, but not matters that are strictly executive or administrative. [Citation.]" (*Empire Waste, supra,* 67 Cal.App.4th

9

at p. 717, fn. 1; see *Lindelli, supra,* 111 Cal.App.4th at pp. 1112–1113; see *Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1090.) "Under the most frequently stated description of the line between legislative and administrative/executive acts, ' "[a]cts constituting a declaration of public purpose, and making provisions for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence." [¶] . . . "Again it has been said: 'The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.'" [Citation.]' [Citation.]" (*Lindelli, supra,* 111 Cal.App.4th at p. 1113; see *Sacks v. City of Oakland, supra,* 190 Cal.App.4th at p. 1090; *Pettye v. City and County of San Francisco* (2004) 118 Cal.App.4th 233, 241.)

SFMTA's adoption of the Pilot Program has the earmarks of a legislative act, as the resolution declared its public purpose and outlined the ways and means of its accomplishment. We agree with SFMTA that the Pilot Program prescribed a new policy or plan for regulating the system of permitting taxi service in the City. The newly enacted provisions of the Transportation Code enacted by Resolution No. 10-029, set out a new course for the legal treatment of taxi medallions. For the first time in decades, SFMTA would allow certain medallions to be sold. In the trial court, Yesson herself characterized the SFMTA Board as having "created a sea-change in the longstanding Proposition K assumption that taxi medallions were non-transferable City property." On appeal, she asserts that medallion ownership "changed dramatically" with the adoption of Resolution No. 10-029, amending the City's Transportation Code by adding section 1109, subdivision (e) creating the Pilot Program.

10

In determining whether Resolution No. 10-029 was a legislative act by SFMTA, we refer to the above description of the line between legislative and administrative acts and to the following:

It is well established that " '[t]he amendment of a legislative act is itself a legislative act.  The power to legislate includes by necessary implication the power to amend existing legislation." (*City of Sausalito v. County of Marin* (1970) 12 Cal.App.3d 550, 563–564; 58 Cal.Jur.3d (2013) Statutes § 61.)  Here, the initial adoption of Proposition K through an initiative of the people of the City, was unquestionably a legislative act.  (See *O'Connor v. Superior Court* (1979) 90 Cal.App.3d 107, 110, 113–114 [upholding Proposition K as an "initiative ordinance" against constitutional challenges].)  SFMTA's *amendment* of the Transportation Code, (the codification of Proposition K), as it was empowered to do by Proposition A, is a strong indication that the amendment was a legislative act according to this rule.

 "[A]dministrative agencies ' "may have executive, administrative, investigative, *legislative* or adjudicative powers." ' (*Traub v. Board of Retirement* (1983) 34 Cal.3d 793, 799, fn. 3, italics added.)" (*Pettye v. City and County of San Francisco, supra,* 118 Cal.App.4th at p. 244 [San Francisco proposition that required city to replace general assistance with in-kind benefits for housing, utilities, and meals was a legislative act].)  SFMTA exercises both legislative and administrative powers.

Nor does the interim or temporary nature of a program change the legislative character of the decision to enact it. (*Lindelli, supra,* 111 Cal.App.4th at p. 1113 [legislative body's approval of one-year "interim contract" was a legislative act, subject to referendum, as it involved the decision in the first instance of which private entity was best suited to provide services for the duration of the contract].)  In this case, the decision to adopt the short-term Pilot Program involved the same initial policy decision that would qualify a long-term taxi medallion reform program as a legislative act, subject to the referendum process.  (See *ibid.*)

Any doubts about whether  Resolution No. 10-029, authorizing the medallion sales Pilot Program was a legislative act, would be set to rest by the "Rules of Order" adopted

11

by the SFMTA's Board in January 2009, more than a year before the resolution amending the Transportation Code and enacting the Pilot Program was adopted. Article 8, section 1 of the "Rules of Order" provides: "Article 8 – LEGISLATIVE PROCESS [¶] Section 1. Effective Date. Resolutions that adopt provisions of the City's Transportation Code relating to parking, traffic, and taxi service shall go into effect at the beginning of the 31st day after approval if no referendum petition is filed. The foregoing rule shall not affect actions of the board to approve contracts, budgets, departmental policies and other matters that do not amend the San Francisco Transportation Code." (Added January 6, 2009.)

By adopting this section of its Rules of Order, the Board affirmatively recognized and made clear its obligation with respect to the reserved referendum power of local voters. Even though the SFMTA Board cannot enact ordinances (that power being reserved to the Board of Supervisors under the City Charter), the SFMTA Board was empowered by Proposition A, codified at section 8A.101, subdivision (b) of the City Charter, to enact measures that override previous City ordinances concerning taxi service.[4] When exercised, such powers are legislative in nature.

---

[4]Section 8A.101, subdivision (b) of the San Francisco Charter provides in relevant part: "Once adopted, Agency regulations shall thereafter supersede all previously adopted ordinances governing motor vehicles for hire that conflict with or duplicate such regulations."

At oral argument, Yesson for the first time argued that the *only* legislative authority granted to SFMTA by the San Francisco Charter was limited to that encompassed in Charter section 8A.102, subdivision (b) 7 and 8.

Subsection 7 provides in part that SFMTA has "exclusive authority to adopt regulations that control the flow and direction of motor vehicle, bicycle and pedestrian traffic . . . ." (Charter § 8A102, subd. (b) 7.) Subsection 8 provides in part that SFMTA has "exclusive authority to adopt regulations limiting parking, stopping, standing or loading as provided by state law . . . ." (Charter § 8A.102, subd. (b) 8.) Both subsections also state that "Notwithstanding the authority established in [that subsection] to the extent state law contemplates that any Agency action authorized by [the subsection] be effectuated by ordinance, such action shall be effectuated by resolution of the Board of Directors" and "shall be subject to referendum . . . ." (Charter § 8A102, subd. (b) 7(iv) and 8(iii).) These subsections appear aimed at ensuring the right of referendum where

12

**D.** *Yesson's arguments*

Yesson contends the action taken by the SFMTA Board in adopting Resolution No. 10-029 was wholly administrative and, therefore, was effective immediately upon its adoption.[5] She points out that resolutions ordinarily become effective immediately (*Midway Orchards, supra,* 220 Cal.App.3d at pp. 781–782) and asserts that the resolution merely implemented several pre-existing San Francisco Charter provisions. Those provisions are identified by Yesson as found in "Article VIIIA: The Municipal Transportation Agency" and are set forth in the margin.[6] Yesson contends that the goals

state law requires the type of action taken by the SFMTA Board to be taken by ordinance, but the Board acts by resolution.

Nothing in these subsections persuade us that SFMTA does not act legislatively when adopting amendments to the Transportation Code that, as in this case, establish a new policy or plan. If anything, these provisions provide further support for the proposition that SFMTA has both legislative and administrative powers and that the right of referendum is applicable to legislative actions taken by resolution of the SFMTA Board.

[5]Yesson initially argued her position was supported by the "Preface to the San Francisco Transportation Code," which states in part that "Users should note that the *operative* date of an ordinance may be later than the *effective* date of the ordinance. A delayed *operative* date will be noted in the ordinance." (Italics added.) As SFMTA pointed out in its respondent's brief and as Yesson recognizes in her appellant's reply brief, the provision is irrelevant here as it speaks to ordinances, whereas Resolution No. 10-029 was a resolution. Furthermore, there is a distinction between a measure's "operative" date—the date the legislative body intends a restriction it has enacted to begin to bind the restricted entities—and its "effective date" the date on which the measure, as a legal enactment, becomes law. That the effective date of the resolution, if subject to referendum, was 31 days after its enactment does not mean there was any "delayed operative date."

[6]Section 8A.100. Preamble.: "(a) An effective, efficient, and safe transportation system is vital for San Francisco to achieve its goals for quality of life, environmental sustainability, public health, social justice, and economic growth. . . ." Yesson points to items two items found in subdivision (c) of the Preamble as particularly relating to the policy of financial accountability. "(c) Specifically, San Francisco residents require: [¶] . . . [¶] 6. Responsive, efficient and accountable management; [¶] . . .[¶] 12. A well-managed and well-coordinated transportation system that contributes to a livable urban environment."

13

and objectives identified by the SFMTA staff report proposing the Pilot Program describe the stated goals and objectives in language similar to that found in the Charter's article VIIIA.100 ("Preamble") and in its article VIIIA.115 ("Transit First Policy"). [7]

---

Yesson also refers to several provisions of the City Charter, section 8A.115 – "Transit-First Policy":

"The following principles shall constitute the City and County's transit-first policy and shall be incorporated into the General Plan of the City and County. All officers, boards, commissions and departments shall implement these principles in conducting the City and County's affairs:

"1. To ensure quality of life and economic health in San Francisco, the primary objective of the transportation system must be the safe and efficient movement of people and goods.

"2. Public transit, including taxis and vanpools, is an economically and environmentally sound alternative to transportation by individual automobiles.

"3. Decisions regarding the use of limited public street and sidewalk space shall encourage the use of public rights of way by pedestrians, bicyclists, and public transit, and shall strive to reduce traffic and improve public health and safety.

"[¶] . . .[¶]

"10. The City and County shall encourage innovative solutions to meet public transportation needs wherever possible and where the provision of such service will not adversely affect the service provided by the Municipal Railway."

[7]Yesson identifies the following "Goals" and "Objectives" of the Pilot Program, set forth in the staff report proposing the program, that she maintains indicate the program was an administrative program designed to carry out the Charter provisions:

"Goal 1: Customer Focus: To provide safe, accessible, clean, environmentally sustainable service and encourage the use of auto-alternative modes through the Transit First Policy.

" Objective 1.1: Improve safety and security across all modes of transportation. [¶] . . .[¶]

"Goal 3: External Affairs/Community Relations: To improve the customer experience, community value, and enhance the image of the SFMTA, as well as ensure SFMTA is a leader in the industry.

"Objective 3.1: Improve economic vitality by growing relationships with businesses, community and stakeholder groups. [¶] . . .[¶]

"Goal 4: Financial Capacity: To ensure financial stability and effective resource utilization.

"Objective 4.1: Increase revenue by 20 percent or more by 2012 by improving collections and identifying new sources."

14

It is not surprising that the general goals and objectives of the Pilot Program, such as providing safe, environmentally sustainable and economically feasible alternatives to individual automobile transportation, would mirror the even more general and lofty goals and policies of the "Municipal Transit Agency" article of the City Charter. It is not simply the statement of goals and objectives of a resolution that determines whether it was the product of a legislative act. Rather, it is what the resolution actually *does*. The "Transit First Policy" contained in the City Charter mentions taxis only in the context of including them as "public transit" and an "economically and environmentally sound alternative to transportation by individual automobiles." It does not mention permits or medallions at all. Yesson cannot point to any resolution or ordinance before SFMTA Resolution No. 10-029 that enacted a policy of allowing medallion sales. Through this resolution and subsequent ones, SFMTA made new law. This resolution did not merely implement previously adopted policies, but created a wholly new policy and plan of allowing qualified medallion holders to sell their medallions. As SFMTA points out, there are many very different, and in some cases diametrically opposed, ways in which SFMTA might try to further these general goals. For instance, it could make medallions entirely non-transferable; it could allow all medallions to be sold in a free market; it could, as it did, allow specified taxi medallions held by eligible persons to be sold for consideration to qualified purchasers. The choice among these alternatives was a significant *policy* choice. Acts declaring such new public policy are the essence of the exercise of legislative power. (*Pettye v. City and County of San Francisco, supra,* 118 Cal.App.4th at pp. 241, 244.) The adoption of a dramatically different and wholly new policy of allowing limited medallion sales was a legislative act and, therefore, was subject to the people's right of referendum.

Yesson contends that only where a resolution is passed with all the formalities of an ordinance does it become a legislative act subject to referendum and the 30-day waiting period, rather than an administrative act. However, her sole authority, *City of Sausalito v. County of Marin, supra,* 12 Cal.App.3d at pp. 565–566 [holding that although a resolution adopting a master plan was legislative in substance, it was invalid

15

in form where it was not executed by ordinance], did not address the circumstances under which resolutions are subject to referendum.   Moreover, her argument is counter to established authority holding, "any legislative act may be . . . subject to referendum, regardless of whether that act is denominated an 'ordinance' or 'resolution.' " (*DeVita v. County of Napa, supra,* 9 Cal.4th 763, 787, fn. 9; accord, *Midway Orchards, supra,* 220 Cal.App.3d at p. 777.)  Nor could a legislative body insulate its enactments from referendum by clothing them as less formal resolutions. (*Midway Orchards, supra,* 220 Cal.App.3d at p. 782.)

Yesson maintains that the language of the resolution itself indicates it was intended to be effective immediately, as it stated, "the Board adopts the Taxi Medallion Sales Pilot Program," and "that any Medallion offered to an applicant on the waiting list after February 16, 2010 shall be counted toward the number of Medallions offered to Waiting List applicants pursuant to the . . . Pilot Program."  She urges we may infer from this language that SFMTA staff anticipated the Pilot Program commenced upon its adoption at the February 26, 2010 meeting.  She finally notes the SFMTA secretary's certification the resolution was "adopted" February 26, 2010.  Nothing in this language indicates to us that adoption of the resolution was administrative rather than legislative in nature or that it was intended to be effective immediately.  The resolution appears to simply use the date February 16 as a convenient benchmark for counting medallions to be issued according to the old, Proposition K-based system, to indicate the old system was not being completely eliminated, but remained in place while the Pilot Program was being implemented.  Nor does the certification that the resolution was "adopted" on February 26 add anything to the question whether such adoption was a legislative act subject to referendum.

Nor are we persuaded that the action of the SFMTA Board was not "legislative" by language in the staff report for the February 26, 2010 board meeting at which the Pilot Program was adopted or the March brochure referencing the board's adoption of the Pilot Program on February 26, and speaking of "regulations that have already been adopted" and posted on a website.  These references by staff to "adoption" dates do not suggest

16

staff was addressing the issue of whether the resolution was subject to a 30-day referendum period. Moreover, if the nature of the action was "legislative," the California Constitution mandated the 30-day referendum period, during which the resolution could not take effect. Neither SFMTA Board or the agency staff could avoid the referendum period, even had they wished to do so, as the referendum right is guaranteed by the California Constitution and by the City Charter. (See *Midway Orchards, supra,* 220 Cal.App.3d at pp. 778–779.)

Yesson argues the measures contained in Resolution No. 10-029 "were simply ratifications of interim administrative proposals made by SFMTA staff and were not subject to referendum." We disagree. That staff previously had made recommendations for such a policy shift is irrelevant to whether the particular act is legislative or administrative in nature. Staff does not have the ability to make law. Only the legislative body can do so. Yesson's argument suggests that a legislative body could insulate its actions from referendum by ensuring a staff recommendation preceded the change in policy or plan. That is clearly not the case. (*Midway Orchards, supra,* 220 Cal.App.3d at p. 782.)

We conclude the trial court did not err in determining that Enrico never acquired the right to sell taxi medallion T-291 and in denying Yesson's petition.

DISPOSITION

The order denying Yesson's petition for an order determining ownership of disputed trust property and for additional relief is affirmed. The City is awarded its costs in connection with this appeal.

_____
Kline, P.J.

We concur:

_____
Haerle, J.

_____
Richman, J.

17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TINA YESSON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO MUNICIPAL<br>TRANSPORTATION AGENCY,<br><br>    Defendant and Respondent. | A136527<br><br>(Sonoma County Super. Ct.<br>No. SPR83944)<br><br>**ORDER GRANTING MOTION FOR<br>JUDICIAL NOTICE IN SUPPORT OF<br>PETITION FOR REHEARING,<br>DENYING PETITION FOR<br>REHEARING, AND CERTIFYING<br>OPINION FOR PUBLICATION** |

**THE COURT:**

The opinion in the above-entitled matter was filed on January 30, 2014, and was not certified for publication in the Official Reports.

Appellant's motion for judicial notice in support of petition for rehearing is granted. Appellant's petition for rehearing is denied.

For good cause, respondent's request for publication of the opinion filed in this matter on January 30, 2014 is granted.

Pursuant to California Rules of Court, rules 8.1105 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: _____        _____
                                                        Kline, P.J.

1

Trial Court:                  Sonoma County Superior Court

Trial Judge:                  Hon. Mark Tansil

Attorney for Appellant:       Law Office of Steven Schoonover
                              Steven Thomas Schoonover

Attorneys for Respondent:     Dennis J. Herrera, City Attorney
                              City and County of San Francisco
                              Wayne Kessler Snodgrass, Deputy City Attorney