Filed 10/30/14  Estate of Williams CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

<table>
<tr><td>Estate of ROOSEVELT WILLIAMS,<br>Deceased.</td><td></td></tr>
<tr><td>OLEVIA STEWART-WILLIAMS, as<br>Administrator, etc.,<br><br>     Petitioner and Appellant,<br><br>v.<br><br>DIONNE WILLIAMS et al,<br><br>     Objector and Respondent.</td><td>A138724<br><br>(Alameda County<br>Super. Ct. No. RP10533844)</td></tr>
</table>

Roosevelt Williams acquired a San Francisco taxi medallion in 1978 and had a long ensuing career as a taxi driver.  He married Olevia[1] in 1992, and he died intestate in April 2010.  Roosevelt had three children from a prior marriage, including Dionne.[2]  Shortly before he died, Roosevelt surrendered his taxi medallion, and it was placed on a list to be sold under a program allowing for such sales.  The sale occurred after Roosevelt's death.

The issue in this case is how the proceeds from the sale are to be distributed.  The probate court determined that they are separate marital property and are to be shared

---

[1] We refer to the involved parties by their first names because they share the same last name.

[2] The other children are Billy Williams and Natalie Carter.  Dionne alone has filed a brief on appeal.

among the children and Olevia.  On appeal, Olevia contends that the proceeds are community property to which she is solely entitled.  We agree with her and therefore reverse.

## FACTUAL BACKGROUND
## AND PROCEDURAL HISTORY

In 1978, Roosevelt was issued a taxi medallion authorizing him to operate a taxi in San Francisco.[3]  Shortly before he died, Roosevelt surrendered his medallion under the Taxi Medallion Sales Pilot Program of the San Francisco Municipal Transportation Authority (SFMTA) that allowed medallion holders to surrender their medallions if they were disabled or would be over 70 years of age as of December 31, 2010.  Under that program, surrendered medallions were placed on a waiting list and sold to the next qualified buyer.  When Roosevelt's medallion sold, the sale netted about $250,000, although $50,000 was used to pay medallion-transfer expenses and a mandatory taxi-fund fee.  The balance went to Roosevelt's estate.

Dionne objected to Olevia's petition for a final distribution of Roosevelt's estate.  She claimed that the proceeds from the medallion's sale should be characterized as separate marital property since the medallion was acquired by Roosevelt long before his marriage to Olevia.  The probate court agreed with Dionne.

## DISCUSSION

### I. *The Standard of Review.*

The factual findings that underpin the characterization of property as either community or separate are reviewed for substantial evidence.  (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734 (*Rossin*).)  But "[i]nasmuch as the basic 'inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values,' the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law.  [Citation.]  As such, it is examined de novo."  (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184 (*Lehman*).)

---

[3] San Francisco Transportation Code sections 1101, subdivision (a)(1)(B)(i) and 1102 (Transportation Code).

*II. The Proceeds from the Medallion's Sale Are Community Property.*

Whether the proceeds from the medallion's sale are community or separate property matters here because of Probate Code section 6401, which controls the distribution of assets when a person dies without a will (intestate).[4] If the proceeds are deemed to be separate property under this section, Roosevelt's three children are entitled to share two-thirds and Olevia is entitled to the other third. But if the proceeds are deemed to be community property, then Olevia is entitled to the entire amount.

We begin with an overview of the law governing the characterization of property as community or separate. "In general, all property that a spouse acquires during marriage before separation is community property." (*In re Marriage of Green* (2013) 56 Cal.4th 1130, 1134; see also Fam. Code, § 760.[5]) Correspondingly, Family Code section 770, subdivision (a)(1) provides that "[s]eparate property of a married person includes . . . [¶] [a]ll property owned by the person before marriage." This statute creates " 'a general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source.' " (*Rossin, supra,* 172 Cal.App.4th at p. 731.)

"Generally speaking, property characterization depends on three factors: (1) the time of acquisition; (2) the 'operation of various presumptions, particularly those concerning the form of title'; and (3) the determination 'whether the spouses have transmuted' the property in question, thereby changing its character. [Citation.] In some cases, a fourth factor may be involved: whether the parties' actions short of formal transmutation have converted the property's character, as by commingling to the extent

---

[4] Probate Code section 6401 provides, in part: "(a) As to community property, the intestate share of the surviving spouse is the one-half of the community property that belongs to the decedent. . . . [¶] . . . (c) As to separate property, the intestate share of the surviving spouse . . . is as follows: [¶] . . . [¶] (3) One-third of the intestate estate in the following cases: [¶] (A) Where the decedent leaves more than one child."

[5] Family Code section 760 provides: "Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property."

3

that tracing is impossible. [Citation.]" (*Rossin, supra,* 172 Cal.App.4th at p. 732.) But "[p]erhaps the most basic characterization factor is the time when property is acquired in relation to the parties' marital status. [Citation.]' In the words of the California Supreme Court, 'what is determinative is the single concrete fact of time.' [*Lehman, supra,* 18 Cal.4th at p. 183.] Applying the proper analytic focus, therefore, the 'court first looks to see if the right to the payment accrued during marriage' [Citation.] If not, 'it is separate property.' [Citation.]" (*Rossin,* at pp. 735-736.)

Olevia claims that Roosevelt had no property interest in his medallion until the Pilot Program became effective, which occurred during their marriage. She argues that until then the medallion itself was not "property" subject to categorization as either community or separate. According to her, the SFMTA's resolution that adopted the Pilot Program "created a new property right" for qualifying medallion holders, namely, the ability to surrender and sell a previously unsellable medallion. We agree.

Our colleagues in Division Two recently described the Pilot Program and its history. (*Yesson v. San Francisco Municipal Transportation Agency* (2014) 224 Cal.App.4th 108 (*Yesson*).) Before 1978, San Francisco "taxi permits could be inherited, sold, assigned and transferred." (*Id*. at pp. 111-112.) But in "1978, San Francisco voters passed Proposition K, an initiative ordinance establishing a new system of regulation for city-issued taxi medallions. Proposition K barred the inheritance, sale, assignment or transfer of taxi medallions. Under Proposition K, *all taxi medallions belonged to the City,* had to be held by working drivers, and were distributed as they became available to individuals on the medallion waiting list." (*Id.* at p. 112, italics added.)

But problems with the system arose. Demand for medallions far outstripped supply, and the number of drivers on the waiting list grew to include thousands who were required to wait many years for a medallion. (*Yesson, supra*, at p. 112.) Some of these applicants did not receive a medallion until they reached an advanced age. (*Ibid*.) But every medallion recipient was obligated to comply with a local law requiring them to "actually drive his or her taxi for at least 156 four-hour shifts, or for 800 hours, during a

4

single calendar year," and this obligation could be particularly burdensome on older medallion recipients.  (*Id*. at pp. 112-113; Transportation Code, § 1102.)

"In 2007, San Francisco voters passed Proposition A, giving the San Francisco Board of Supervisors the power to transfer regulatory authority over taxi affairs to SFMTA.  Authority to regulate San Francisco taxis passed to SFMTA in March 2009. Subsequently, the SFMTA Board of Directors . . . recodified Proposition K's requirements, as well as additional taxi regulations, in the Transportation Code, division II, article 1100 et seq.  Proposition A also gave the SFMTA Board the power to adopt taxi regulations that would override 'any prior ordinance,' including the provisions of Proposition K." (*Yesson, supra,* 224 Cal.App.4th at p. 112.)  Acting under this authority, the SFMTA Board on February 26, 2010, "approved resolution No. 10-029 [the resolution], adopting amendments to [the Transportation Code] to implement the Pilot Program.  The resolution explained that the '. . . Pilot Program represents an interim measure that would allow the San Francisco taxi industry to gradually transition away from the Waiting List system of Medallion distribution that has characterized the San Francisco taxi industry for 32 years. . . .' " (*Id.* at p. 113, fn. omitted.)

As applied to Roosevelt, this legislative evolution means that until 2010 he held his medallion subject to Proposition K and the local law enacted under it.[6]  Proposition K explicitly designated taxi medallions as the property of the People of San Francisco. Section 1, subdivision (a) of the proposition declared:  "*All taxicab permits* and other vehicle for hire permits issued by the City and County of San Francisco *are the property of the people of the City and County of San Francisco and shall not be sold, assigned or transferred*."  (Italics added.)  And section 1105, subdivision (a)(3) of San Francisco's Transportation Code provides that "[p]ermits granted pursuant to this Article constitute a privilege and *are not the property of the Permit Holder*."  (Italics added.) Subdivision (a)(4) states that "[e]xcept as expressly provided in this Article or in permit

---

[6] Roosevelt first acquired his medallion in 1978, the same year that Proposition K was enacted.  The parties do not argue that the rights Roosevelt acquired at this time were governed by pre-Proposition K law.

5

conditions, no permit issued pursuant to this article shall be transferable or assignable, either expressly or by operation of law."[7]

Thus, before 2010, Roosevelt held an exclusive right to operate a taxi and generate income under his medallion, but he lacked a property interest in the medallion itself. The question we must answer, therefore, is whether he acquired a property interest in the medallion when the Pilot Program became effective. We conclude he did.

In *Yesson*, the plaintiff was the successor trustee of her father's estate, and she petitioned for authority to sell a taxi permit, later replaced with a medallion, that her father acquired in 1968. (*Yesson, supra,* 224 Cal.App.4th at p. 111.) The father died on March 23, 2010—25 days after the SFMTA approved the resolution authorizing the Pilot Program. (*Id*. at p. 113.) The court of appeal in *Yesson* concluded that the father never acquired a right to sell his medallion because he died before the Pilot Program became effective. (*Id*. at pp. 116, 122-124.) According to the court, the resolution did not become effective until the expiration of the 30-day referendum period mandated under the California Constitution for legislative acts. (*Ibid.*) This period did not expire until five days after the father's death.

Unlike the father in *Yesson*, 224 Cal.App.4th 108, Roosevelt was alive when the Pilot Program became effective. Accordingly, he acquired a right to sell the medallion. And since he acquired the right during his marriage to Olevia, the proceeds from the sale of the medallion are community property.

Olevia rightly points to *Lehman, supra,* 18 Cal.4th 169 and *Rossin, supra,* 172 Cal.App.4th 725 in support of her contention that timing of the accrual of a property interest is the decisive factor in characterizing it as either separate or community. *Rossin* held that a wife's disability insurance policy was her separate property even though the wife started collecting benefits during marriage because the policy was purchased and all

---

[7] Proposition K originally stated at section 4, subdivision (a): "No permit issued under this Ordinance shall be transferrable or assignable, either expressly or by operation of law. All such permits and all rights granted under them may be rescinded and ordered revoked by the Police Commission for good cause."

premium payments were paid before the marriage. (*Id*. at p. 735.) Thus, her right to receive payment was perfected before the marriage.

In *Lehman,* the husband's employer offered a defined-benefit plan to its employees. (18 Cal.4th at pp. 174-175.) After the couple divorced, the employer offered, and the husband accepted, an enhanced retirement program designed to encourage early retirement. (*Id*. at p. 175.) The wife later sought a determination that she owned a community property interest in the enhanced benefits. (*Id*. at p. 176.) The trial court awarded the wife her proportionate community share of the retirement benefits based on the length of the marriage, including an amount attributable to the enhancement. (*Ibid*.) Both the court of appeal and the Supreme Court affirmed. (*Id*. at pp. 176-177.) The Supreme Court reasoned that a defined-benefit pension plan can be apportioned between separate property and community property based on the number of years that the employed spouse worked during the marriage: "It follows that a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced. That is because, practically by definition, the right to retirement benefits that accrues, at least in part, during marriage before separation underlies any right to an enhancement. [Citation.]" (*Lehman,* at p. 179-180.)

Applying these principles here, the proceeds from the medallion's sale are properly characterized as community property because Roosevelt acquired his property interest in the medallion in 2010 while he was married to Olevia. Thus, under the provisions of Probate Code section 6401, subdivision (a), Olevia has a 100 percent ownership interest in the proceeds from the medallion's sale because Roosevelt died intestate.

## DISPOSITION

The order of the probate court is reversed and the case is remanded for proceedings consistent with this opinion.

7

_____
Humes, P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.

8